IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| NEVILLE CHEMICAL COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | 2:17-CV-00334-CRE |
| | ) | |
| vs. | ) | |
| | ) | |
| TIG INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION[1]**

CYNTHIA REED EDDY, Chief United States Magistrate Judge.

I.       **INTRODUCTION**

Plaintiff Neville Chemical Company ("Neville") initiated this insurance contract declaratory judgment action pursuant to 28 U.S.C. §2201 on March 15, 2017 generally alleging it is entitled to be indemnified in connection with an Excess Workers Compensation Insurance Policy (the "Policy") issued by TIG Insurance Company ("TIG"). This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

Presently pending before the Court are the following:

(1) A motion for summary judgment filed by Neville (ECF No. 52); and

(2) A motion for summary judgment filed by TIG (ECF No. 56).

For the reasons that follow, Neville's motion for summary judgment is denied and TIG's motion for summary judgment is granted.

---

[1]       All parties have consented to jurisdiction before a United States Magistrate Judge; therefore the Court has the authority to decide dispositive motions, and to eventually enter final judgment. *See* 28 U.S.C. § 636, *et seq*.

**II.     BACKGROUND**

This declaratory judgment action was commenced by Neville against TIG in relation to TIG's Excess Worker's Compensation Insurance Policy in which Neville seeks indemnification for worker's compensation benefits in excess of the Policy's retention amount paid to a former Neville employee.

a.   Facts related to Neville's employee's injuries

The facts surrounding Neville's former employee's work-related injuries and medical treatment are not in dispute.  In June 1993, Larry Kelley was employer by Neville as a pump mechanic and sustained a work-related injury to his lower back while installing a hot oil pump. Mr. Kelley was diagnosed with a L5-S1 disc herniation and underwent a laminectomy with a bilateral microdiscectomy at the L5 and L5-S1 level on February 16, 1994.  A follow-up of Mr. Kelley's lumbar spine completed in September 1995 did not show evidence of spinal stenosis or herniations at any level.  During this time, Mr. Kelley submitted a worker's compensation claim to Neville.  Neville filed an Employer's Report of Injury, and accepted liability for Mr. Kelley's work-related injury through issuance of a Notice of Compensation Payable.  Mr. Kelley returned to work following his surgery on January 11, 1995, missed a day in March 1995 and then was again out of work from August 31, 1995 to December 7, 1995.

Mr. Kelley was able to return to work from December 1995 through January 8, 2001. During this time, Neville claims that Mr. Kelley never worked in a full capacity and always had help from other Neville employees to do his job, but it is undisputed that from April 1996 through January 2001, no indemnity or wage loss payments were made by Neville for Mr. Kelley's 1993 injury.  Neville maintains that while Mr. Kelley did not submit any medical expense claims through worker's compensation, he did seek medical treatment periodically with Neville's company

physician.

On December 28, 2000, Mr. Kelley had a work-related incident relating to his lower back that he reported on February 7, 2001.  Mr. Kelley was off work from January 8, 2001 through January 31, 2001.  As a result of this alleged work-related injury, Mr. Kelley submitted a new worker's compensation claim.  On February 13, 2001, Neville's company physician was asked if the alleged new injury was a new injury or was related to his old back injury.  The physician believed Mr. Kelley's symptoms related to his old June 1993 injury.  On February 20, 2001, Neville denied Mr. Kelley's new worker's compensation claim stating that Mr. Kelley did not suffer a work-related injury, but rather suffered a possible aggravation of a pre-existing condition related to the June 1993 incident.  As a result of this determination, Neville paid Mr. Kelley worker's compensation benefits based on a recurrence of his previous June 1993 work-related injury.  Mr. Kelley did not appeal or dispute Neville's decision to pay him benefits based on a recurrence of his June 1993 injury.

At some point in July 2003, Mr. Kelley started experiencing lower back pain.  While he could not recall any particular event giving rise to this pain, he believed the pain to related to playing around with a motor.  As a result, Mr. Kelley saw a physician to determine if his lower back pain was a recurrence of his 1993 work-related injury or if it was a new injury.  The physician noted that Mr. Kelley had a recurrence of his back pain and his right leg pain.  Mr. Kelley did not submit a new claim for worker's compensation and was paid medical and indemnity payments under his previous June 1993 claim.  Mr. Kelley attempted to return to work in January 2005 but left full time work in late-January 2005 and has not worked since that time.

Following Mr. Kelley's departure, Neville and third-party administrators continued to handle Mr. Kelley's worker's compensation claim arising from his June 24, 1993 work-related

injury.  Mr. Kelley underwent several independent medical examinations to determine the status of his medical condition, its cause and whether he could return to work.  One physician, Daniel A. Wecht, M.D. M.S.c. FACS, opined that Mr. Kelley's continued symptoms relate largely to his original June 1993 work injury and progressive degenerative change. Dr. Wecht does not believe that Mr. Kelley is ever likely to return to his original work activities as a millwright.

>    b.  TIG Policy

At the time of Mr. Kelley's June 1993 work-related injury, Neville had a self-insured worker's compensation program that covered worker's compensation claims up to a self-insured retention limit of $500,000 per occurrence.  In addition to this program, Neville held a Specific Excess Workers Compensation and Employers Liability Policy issued by TIG with a policy period from January 1, 1993 to January 1, 1994.  The Policy provided that TIG would indemnify Neville for losses resulting from an occurrence related to a worker's compensation claim if it were covered under Neville's qualified self-insured retention plan and exceeded Neville's self-insured retention limit ("SIR").

As to the policy's coverage, the Policy states in pertinent part:

PART 1. COVERAGE

Self-Insured Indemnity Coverage.  The Company [TIG] will indemnify the Insured [Neville] for loss resulting from an occurrence during the contract period provided either:

(1)    such loss would be covered under the Insured's qualified self-insured retention plan in those states named in Item 3 of the Declarations, or;
(2)    such loss would be compensable under the Workers Compensation Act of any state for employees injured who are normally employer in a state named in Item 3 of the Declarations and then only for that portion of loss, not exceeding the benefits of the state in which the injured employees are normally employed.

(ECF No. 55-20).

The Policy also contains a retention and limit of indemnity provision which states:

4

PART 2. RETENTION AND LIMIT OF INDEMNITY

No indemnity shall be afforded under this Policy, unless and until the Insured shall first have sustained loss as a result of **each occurrence** in excess of the amount of the Retention stated in Item 5 for the types of coverage involved of(sic) the Declarations.  The Company hereby agrees to indemnify the Insured against loss as a result of each occurrence in excess of such Retention. . .

(ECF No. 55-20) (emphasis added).

The Policy defines "occurrence" as "applied to bodily injury, shall mean 'accident'. Occupational disease sustained by each employee shall be deemed to be a separate occurrence and occurrence shall be deemed to take place on the date upon which the employee is last exposed at work to conditions allegedly causing such occupational disease[.]"  "Occupational disease" is defined as including "cumulative injuries."  *Id*.

On April 7, 2015, Neville contacted TIG seeking reimbursement under the TIG Excess Policy in relation to Mr. Kelley's worker's compensation.  Neville requested reimbursement for indemnity, medical and expenses and indicated the total amount of payments at that time amounted to $505,129.90.  Under the Policy, Neville sought reimbursement for $5,129.90 which exceeded the SIR at that time.  As of June 2020, Neville claims it has paid $241,320.67 above its SIR and that amount will continue to increase by $868.96 every two weeks for indemnity payments made to Mr. Kelley and will increase for any paid medical expenses and other allowable expenses under the Policy.  TIG did not honor Neville's request for reimbursement and Neville initiated this declaratory judgment action seeking a declaration that TIG has a duty to indemnify it for all payments made in connection to Mr. Kelley's worker's compensation benefits exceeding the SIR.

## III.     STANDARD OF REVIEW

The standard for assessing a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is well-settled. A court should grant summary judgment if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 250.

On a motion for summary judgment, the facts and the inferences to be drawn therefrom should be viewed in the light most favorable to the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Hudson v. Proctor & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48.  An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with respect to that issue. *Id*.  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'." *Matsushita*, 475 U.S. at 587; *Huston*, 568 F.3d at 104.

A plaintiff may not, however, rely solely on his complaint to defeat a summary judgment motion. *See, e.g., Anderson*, 477 U.S. at 256 ("Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of

his pleading, but must set forth specific facts showing that there is a genuine issue for trial."). Allegations made without any evidentiary support may be disregarded. *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000).

Where, as here, there are cross-motions for summary judgment, it is simply a claim by each party that it alone is entitled to summary judgment. *Canal Ins. Co. v. Sherman*, 430 F. Supp. 2d 478, 483 (E.D. Pa. 2006). Cross motions for summary judgment "do not constitute an agreement that if one is denied the other is necessarily granted, or that the losing party waives judicial consideration and determination of whether genuine issues of material fact exist." *Id*. "When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard*." Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006).

## IV.    DISCUSSION

While there are competing motions for summary judgment because the main basis for each party's motion is whether the plain language of the Policy requires indemnity, the motions will be addressed in tandem, unless otherwise noted.

Under Pennsylvania law, the "interpretation of an insurance contract regarding the existence of non-existence of coverage is generally performed by the court." *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (citations omitted). An insurance policy must be read as a whole and not "in discrete units." *Luko v. Lloyd's London*, 171, 573 A.2d 1139, 1142 (Pa. Super. 1990). If the policy's language is clear and unambiguous, the court must give effect to that language. *Donegal Mut. Ins. Co*., 938 A.2d at 290 (citations omitted). If, however, the policy's language is "reasonably susceptible of different constructions and capable of being

understood in more than one sense[,]" it is considered ambiguous and should be "construed in favor of the insured and against the insurer, the drafter of the agreement." *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 558 (3d Cir. 2008) (applying Pennsylvania law (citations omitted)). Where a provision is ambiguous, "the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Id*. (citations omitted). Where terms are left undefined in an insurance policy, such terms must be afforded their plain meaning as set forth in the dictionary. *Aleynikov v. Goldman Sachs Group, Inc.*, 765 F.3d 350, 360 (3d. Cir. 2014) ("dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." (citation omitted)).

a. Neville's Motion for Summary Judgment

In support of its motion for summary judgment, Neville argues that Mr. Kelley's periods of disability in 2001, 2003 and after January 2005 were caused by "recurrences" of his June 1993 work-related injury and therefore the insurance coverage in effect at that time of the June 1993 original injury would be responsible for providing insurance coverage for the recurrences. In support of its argument, Neville maintains that under worker's compensation law in Pennsylvania, a claimant who suffers a "recurrence" of an initial injury should be paid worker's compensation benefits from his original employer (and by extension under that employer's coverage, if any), and that a claimant who suffers an "aggravation" of an initial injury should be paid worker's compensation benefits from his current employer because there has been a new injury. (ECF No. 53 at 8-10). Neville argues that Mr. Kelley's medical records and testimony from treating physicians prove that Mr. Kelley's injuries were recurrences and therefore TIG is responsible for coverage under the Plan. Neville points out that its own company doctor in 2001 and 2003

indicated his belief that the injury was related to Mr. Kelley's 1993 injury and in 2001 when Mr. Kelley attempted to file a new worker's compensation claim, Neville denied the claim and Mr. Kelley accepted his worker's compensation benefits paid to him from his June 1993 claim. (*Id*. at 11-12).

TIG responds that distinguishing between recurrence and aggravation of injury is irrelevant with respect to excess workers compensation coverage at issue because while that distinction is made under worker's compensation laws in Pennsylvania, the issue here is controlled by private contracts and the insurance policy at issue does not impact Mr. Kelley's right to workers' compensation benefits. (ECF No. 62 at 4-5).

The Court agrees with TIG.   While the distinction between a "recurrence" and "aggravation" of an injury is relevant in determining an employer's responsibility to pay worker's compensation benefits, that is not the issue before the Court.   Rather, the court must determine whether TIG has the duty to indemnify Neville under the terms of the Policy, not whether Neville must pay Mr. Kelley's worker's compensation benefits.   Accordingly, Neville's motion is denied in this respect.

b. Duty to indemnify

Next, Neville argues that TIG is obligated to indemnify it under the terms of the Policy for all worker's compensation benefits paid to Mr. Kelley as the result of his June 1993 work-related accident above Neville's $500,000 retention limit up to the policy limits stated within the Policy. Ostensibly relying on its previous argument made under worker's compensation laws, Neville argues that "[u]nder Pennsylvania law, a recurrence of an injury would relate back to the date of the injury and the insurance carrier in effect at the time of original loss would be responsible for coverage." (ECF No. 53 at 18).  Neville cites to no case law to support its proposition, and indeed

cites to no portion of the Policy which includes the term "recurrence."

TIG responds that the issue is whether Mr. Kelley's work injuries constitute one occurrence or multiple occurrences under the Policy and whether the SIR limit was satisfied under any one occurrence. (ECF No. 62 at 7).   TIG maintains that under the Policy's plain language, Mr. Kelley's injuries were the result of multiple occurrences, each of which has a separate SIR that have not been satisfied. *Id*.   TIG also moves for summary judgment on the identical issue that under the plain language of the policy, Neville is not entitled to indemnification. Specifically, TIG argues that Mr. Kelley sustained injuries from multiple occurrences, the post-July 2003 time-off-work and medical treatment results from a separate occurrence under the Policy and Neville has not satisfied the SIR on the 1993 claim and is not entitled to coverage.  Because these arguments in support of summary judgment are two sides of the same coin, the two motions will be addressed in tandem.

   When determining coverage under an insurance policy, the court first looks to the plain language of the contract to determine if it is ambiguous.  Here, the Policy provides that TIG would indemnify Neville for losses resulting from an "occurrence" during the contract period in excess of the retention amount.  The policy defines "occurrence" as "applied to bodily injury, shall mean 'accident.'  Occupational disease sustained by each employee shall be deemed to be a separate occurrence and shall be deemed to take place on the date upon which the employee is last exposed at work to conditions allegedly causing such occupational disease[.]" (ECF No. 55-20).  As such, the Policy unambiguously covers two types of occurrences: accident and occupational disease suffered by an employee.

The Policy defines "bodily injury" as "includ[ing] death resulting therefrom, but shall not include occupational disease." (ECF No. 59-1 at 24).  While the Policy also defines "bodily injury"

as "accident," it does not define the term "accident." An undefined term alone does not constitute ambiguity and the court may consult the undefined term's ordinary meaning. *Aleynikov*, 765 F.3d at 360. Black's Law Dictionary defines "accident" as: "An unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated; any unwanted or harmful event occurring suddenly, as a collision, spill, fall or the like, irrespective of cause of blame." "Accident," Black's Law Dictionary (11th ed. 2019). The Oxford Dictionary defines accident as: "1. an unexpected and unpleasant event. 2. An event that is unforeseen or has no apparent cause." "Accident," Oxford English Dictionary of Current English (3d. ed. 2008). As stated by another court, "[t]he key to both dictionaries' treatment of "accident" is the unexpected or unforeseen nature of the event." *Allegheny Ludlum, LLC v. Liberty Mut. Ins. Co.*, No. 2:17-CV-1243-WSS, 2020 WL 6361858, at *6 (W.D. Pa. Sept. 17, 2020). Moreover, an accident is finite, meaning that the "event" giving rise to the accident ends and as opposed to being a continual occurrence.

The Policy defines "occupational disease" as "includ[ing] death resulting therefrom and cumulative injuries." (ECF No. 59-1 at 24). The Policy does not define "cumulative injuries" and elsewhere indicates that occupational disease as covered under the Policy relates to exposure to work conditions causing the disease. Black's Law Dictionary defines "cumulative" in pertinent part as: "1. Including all the amounts previously added[.]" "Cumulative," Black's Law Dictionary (11th ed. 2019). Additionally, the Merriam-Webster Dictionary defines "cumulative" in pertinent part as: "1a: increasing by successive additions b. made up of accumulated parts." "Cumulative." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/cumulative. *Accessed 16 Mar. 2021*. Black's Law Dictionary defines "injury" in pertinent part as: "3. Any harm or damage." "Injury," Black's Law Dictionary (11th ed.

2019).  Additionally, the Merriam-Webster Dictionary defines "injury" in pertinent part as "1: hurt, damage, or loss sustained 2a: an act that damages or hurts[.]" "Injury," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/injury. *Accessed 16 Mar. 2021*.  Therefore, under its plain meaning, "cumulative injuries" as used in the Policy means all successive hurt, damage or loss considered together.  The Policy therefore broadly defines occupational disease as including cumulative physical injuries and exposure to all work conditions and does not for example limit occupational disease to cancer, sickness from asbestos exposure, respiratory illnesses and the like.  The Policy provides that no indemnity shall issue unless and until a loss is sustained "as a result of each occurrence in excess" of the retention amount.  If the "occurrence" is due to occupational disease, it is treated as a separate occurrence and is deemed to take place on the date upon which the employee is last exposed to the work condition.

As applied here, while Mr. Kelley's injuries suffered during his employment can be considered an "accident" and/or an "occupational disease," neither analysis triggers TIG's duty to indemnify Neville under the plain language of the Policy.

While Neville would have this court find that any and all injuries suffered by Mr. Kelley following his initial June 1993 injury constitutes a "recurrence" or "aggravation" of his initial injury and thus covered under the scope of the Policy, such a finding has no basis under the plain language of the Policy.  The Policy includes no terms that the recurrence or aggravation of an initial injury, even when resulting in the payment of Worker's Compensation benefits under the initial injury, can be attributed to first occurrence to meet the SIR threshold.  In fact, the plain language of the Policy provides the opposite: when considering "cumulative injuries," under the occupational disease occurrence, it is considered a separate occurrence and deemed to take place

on the date the employee is last exposed to the condition.  Even assuming that the injuries Mr. Kelley sustained after the 1993 accident were an aggravation or recurrence of his initial injury as Neville claims, under the plain terms of the Policy, those injuries fall under the occupational disease occurrence definition, as the injuries were cumulative, successive injuries considered together.  Because under the Policy, injuries under the occupational disease occurrence definition are deemed to take place on the last date of the employee's exposure to the condition, Mr. Kelley would have been exposed until his last day of work in July 2003.   The Policy was not in effect at this point because it lapsed in 1994, and therefore TIG has no duty to indemnify Neville under the plain language of the Policy.

Even if the court were to assume that Mr. Kelley's injuries should be considered as "bodily injury" occurrences under the Policy, TIG would have no duty to indemnify as each occurrence is treated separately with regard to the SIR.  It is undisputed that Neville did not meet the SIR threshold as to each bodily injury occurrence as mandated by the Policy and instead only met the loss when considering the SIR amount paid by Neville collectively.

Neville again argues that it consistently considered all of Mr. Kelley's post-1993 injuries as related to and recurrences of his initial injury, that it paid Mr. Kelley worker's compensation benefits under the 1993 claim and that Mr. Kelley did not appeal Neville's decision.  However, these facts are not relevant to determine whether TIG is obligated to indemnify Neville under the plain language of the Policy.  Adopting Neville's argument would result in the court impermissibly contradicting the Policy and adding provisions into the Policy that do not exist by specifically contradicting the provision to treat each occurrence separately to meet the SIR amount and by adding a provision that losses sustained for a recurrence of an injury can be comingled to meet the SIR and trigger indemnification.  Considering the unambiguous language of the Policy as a whole,

13

TIG's duty to indemnify Neville in connection with Mr. Kelley's injuries was not triggered and TIG is therefore entitled to judgment as a matter of law.

## V.     CONCLUSION

Based on the foregoing, Neville's motion for summary judgment is denied and TIG's motion for summary judgment is granted.  An appropriate Order follows.

Dated: March 17, 2021

By the Court,
s/ Cynthia Reed Eddy
Cynthia Reed Eddy
Chief United States Magistrate Judge